J-S14037-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.R.O., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 72 MDA 2021 |

Appeal from the Decree Entered December 15, 2020
In the Court of Common Pleas of Schuylkill County Orphans' Court at
No(s):  A63-061-19

BEFORE:  BOWES, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED JULY 22, 2021**

M.W. ("Father") appeals the Decree granting the Petition to involuntarily terminate his parental rights to M.R.O. ("Child") (a female born in April 2011), his child with J.G. ("Mother"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b), filed by Mother and her husband, B.G., ("Stepfather") (collectively, "Petitioners" or "Appellees"), so that Stepfather may adopt Child.  We affirm.

On December 9, 2019, Petitioners filed both the Petition for the involuntary termination of Father's parental rights and a Petition for adoption. On January 10, 2020, the trial court appointed Thomas J. Campion, Jr., Esquire ("Attorney Campion"), to represent Father, and Lori A. Schafer-Guzick, Esquire ("Attorney Schafer-Guzick"), as legal interest counsel for

Child.[1]  On August 25, 2020, the trial court held an evidentiary hearing on the termination Petition.  At the hearing, Petitioners were present with their counsel; Father was present with Attorney Campion; and Attorney Schafer-Guzick was present on behalf of Child, who was nine years old at the time of the hearing.

Petitioners first presented the testimony of Patrice Gangemi ("Ms. Gangemi"), the Executive Director of Signature Family Services in Pottsville, Pennsylvania.  N.T., 8/25/20, at 5.  Ms. Gangemi testified that Signature Family Services provides parenting education and counseling to families involved with Schuylkill County Children and Youth Services ("CYS"), as well as supervised visits and parenting education to families involved with custody conciliation under a court order.  *Id.* at 5-7.  Ms. Gangemi stated that Family Services did not have any record of Father, Mother, or Child.  *Id.* at 7-8.

Next, Petitioners presented the testimony of Stepfather and Mother's sisters, P.R. and W.S.  *Id.* at 12, 22, 36.  Mother then testified on her own

---

[1] The trial court stated the following:

> Attorney [Schafer-]Guzick testified that she met with the [C]hild on three occasions and that she spoke to [Child] at length about the nature and effect of the termination and adoption proceedings. Attorney Guzick believed that [Child] understood the effects of the proceedings and that there was no conflict between the [C]hild's preference and her best interests in being adopted.  The court is satisfied that Attorney Guzick [could] represent the [C]hild.

Trial Court Opinion, 12/15/20, at 1 n.1; *see also* N.T., 8/25/20, at 4.

behalf.  ***Id.*** at 42.  Finally, Petitioners presented the testimony of Father, as on cross-examination.  ***Id.*** at 63.  Father presented the testimony of T.H., Child's maternal grandmother ("Maternal Grandmother"), and then testified on his own behalf.  ***Id.*** at 84, 115.

The trial court made the following findings of fact based on the testimonial and documentary evidence at the termination hearing that it found credible:

> Mother and Father were not married at the time of the [C]hild's birth but had a long[-]term relationship.  They lived together when [Child] was born in 2011.  Their relationship was "volatile" and "abusive."  Tr., August 25, 2020, p. 44.  There were many break-ups.  Mother would leave and go to her mother's home but then return.  A custody [P]etition was filed in 2012, but Mother continued to go back and forth until finally terminating her relationship with Father in 2015.  During the breakups and after the termination of Mother['s] and Father's relationship, Father saw [Child] for weekend visits on a somewhat regular basis.  Mother and [Stepfather] began dating in about 2015.
>
> In October 2016, after returning from a visit with Father, [Child] started crying in her bathroom and Mother took her to the emergency room.  Mother stopped the visits with Father after that weekend.
>
> A custody [O]rder, dated July 20, 2017, awarded partial physical custody to Father.  His visits were to be supervised at Signature Family Services on an open and reasonable basis as agreed upon by Mother and that agency.  Neither Father nor Mother ever contacted Signature Family Services to set up visits.  In the fall of 2017, Father's house burned down[,] and he moved in with his brother.  Father's brother was to supervise visits.
>
> Father sent texts sporadically to the [M]aternal [G]randmother and she most often did not respond.  In February 2018, he sent her a Facebook message asking about [Child] and asking if he could see her before he left for vacation to Las Vegas and California.  There was a series of messages exchanged

between Father and [M]aternal [G]randmother but she did not allow him to see [Child]. She felt that she was in the "middle" and was uncomfortable in that position. Tr., August 24, 2020, p. 89. Maternal [G]randmother was trying to "do the right thing" for [Child]. Tr., August 25, 2020, p. 101.

On July 20, 2018, Father sent Mother a text message congratulating her on her marriage to [Stepfather]. He asked her what he had to do to see [Child] because he "really missed her a lot." Tr., August 25, 2020, p. 60. Father added that he had taken all the steps to get his "life in order" and that he would like to just talk to [Child] on the phone. Tr., August 25, 2020, p. 61. Mother did not respond to that request.

Sometime after Fall of 2018, Father's text messages to Mother were not returned. He was blocked from Facebook and Facebook Messenger. He never contacted Mother's two sisters via telephone, letter, or otherwise, but contacted Mother's two cousins. It was unclear about the reasons for those attempts or the time frame.

In March 2020, when COVID-19 began, Father testified that he had contact with [Child] through FaceTime, text messages, and phone calls, via arrangements with the [M]aternal [G]randmother. Tr., August 25, 2020, p. 67. He described his phone calls as sometimes lasting three hours and occurring every three, four or five days. Father was hopeful that [M]aternal [G]randmother would arrange a visit with his daughter.

Maternal [G]randmother confirmed that Father reached out to her "a few months ago," in April 2020, asking if he could send [Child]'s birthday presents to her house. T[r]. August 25, 2020, p. 86. Father wanted to "prove" that he still wanted his parental rights to his daughter. Tr., August 25, 2020, p. 86. He sent the gifts. Maternal [G]randmother had [Child] contact Father to say thank you for the birthday gifts. She said it was a very strange conversation because [Child] had not seen him for two years. Tr., August 25, 2020, p. 101. That was the only time he ever sent a gift, card, or letter. Father believed that [Child] would not be given any gifts or letters that he sent so he never tried.

After April 2020, [M]aternal [G]randmother testified there was just one other Facetime contact when she accidently hit the Facetime button. Tr., August 25, 2020, p. 105.

Father says he has not seen [Child] "physically" [for approximately one year]. Tr., August 25, 2020, p. 67. He lived and worked in New Jersey for a year[,] but it was unclear whether it was last year or 2018. Mother says the last physical contact was in October 2018.

Father filed "five times" for custody contempt against Mother between 2011 and 2016. Tr., August 25, 2020, p. 69. Father felt he could not get a "fair shake" about custody; did not want to get arrested, as he did every time he tried to see [Child;] and never got the extra time as ordered from the contempt findings. Tr., August 25, 2020, p. 144. There was one incident in 2016, when he called the police because Mother stopped him from taking [Child] for a custody period. Mother stopped him because the person picking [Child] up was an unlicensed driver. Father never filed a petition for modification of the custody order because he believed that [M]aternal [G]randmother was going to arrange for him to see [Child].

[Father] paid child support from 2011 to 2016. Tr., August 25, 2020, p. 124. He was held in contempt for failing to pay child support and paid fines. His child support arrears are approximately $11,000. Tr., August 25, 2020, p[.] 126. Father is not paying because he thought if he was going to "lose custody" ["]why keep paying["]? Tr., August 25, 2020, [p.] 126.

Father is not currently working and resides with his brother. Tr., August 25, 2020, p. 124. He does not have a driver's license, which he lost due to three DUI convictions. He blames Luzerne County because it refuses to acknowledge that he completed his prison sentence so he can get his license back.

Father is not aware of [Child]'s school, her grade in school, or if she has any pets. He has never attended any medical visits, but Mother never informed him of appointments.

Trial Court Opinion, 12/15/21, at 2-5.

On December 15, 2020, the trial court entered the Decree terminating

Father's parental rights. Father filed a timely Notice of Appeal, along with a

Concise Statement of errors complained of on appeal, pursuant to Pa.R.A.P.

1925(a)(2)(i) and (b).

Father now raises the following issues for review:

1. Whether the trial court abused its discretion in determining the Appellees produced clear and convincing evidence that [Father], by conduct, continuing for a period of at least six (6) months immediately preceding the filing of the [P]etition, either has evidenced a settled purpose of relinquishing settled claim to the minor [C]hild or has refused or failed to perform parental duties, as required by 23 Pa.C.S.[A.] § 2511(a)(1)?

2. Whether the trial court abused its discretion in determining that Appellees produced clear and convincing evidence that the repeated and continued incapacity, abuse, neglect, or refusal of [Father] has caused the minor [C]hild to be without essential parental care, control, or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by [Father], as required by 23 Pa.C.S.[A.] § 2511(a)(2)?

3. Whether the trial court abused its discretion in addressing the second part of the bifurcated process and determining that the parental rights of [Father] should be terminated pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Father's Brief at 4-5.

We will address Father's claims together. Regarding his challenge to

the trial court's determination under 23 Pa.C.S.A. § 2511(a)(1), Father argues

that Mother thwarted his attempts to contact Mother and her family so that

he could maintain a relationship with Child. Father's Brief at 17. Father claims

that Mother and her family refused to answer his calls or respond to him on

social media, and that Maternal Grandmother confirmed these claims. *Id.* at

17, 21-27. Father also contends that there was an incident that occurred

between Stepfather and him in which Stepfather was criminally charged.[2] *Id.* at 28. Father asserts that, as a result, there was a no-contact Order in place that prevented him from contacting Stepfather to see Child, and a Pennsylvania State Trooper advised Father to stay away from Child for his own good. *Id.* at 29.

Regarding his challenge under section 2511(a)(2), Father identifies eleven alleged errors:

(a) [Father] testified and provided written proof that he attempted to contact [Mother] on numerous occasions in order to maintain a relationship with his daughter[,] but [Mother] blocked him and/or refused to answer his calls or respond to him on social media.

(b) [Father] testified and provided written proof that he attempted to contact … Maternal Grandmother … on numerous occasions in order to maintain a relationship with his daughter but [Maternal Grandmother] did not always respond and sometimes refused to answer his calls or respond to him on social media, which was confirmed by [Maternal Grandmother].

(c) [Father] testified that there was a no-contact [O]rder in place preventing him from contacting [Stepfather] to see [Child,] as a result of an incident that occurred in which [Stepfather] was charged, and [Father] was advised by a Pennsylvania State Trooper to stay away from [Child] for his own good.

(d) [Father] testified that [CYS] advised him that he should stop trying to get [Child] back or he would end up in prison.

(e) [Father] testified and provided written proof that he did make contact with … Maternal Grandmother … on numerous occasions in order to maintain a relationship with his daughter.

(f) [Maternal Grandmother] testified that [Father] had attempted to contact her on numerous occasions and that she would usually

_____

[2] The charges were later dropped. Father's Brief at 29.

- 7 -

ignore him, but that she did sometimes respond and provide him with pictures and information about [Child].

(g) [Father] testified that [Maternal Grandmother] did make arrangements for him to visit with [Child] and correspond with her via telephone and social media.

(h) [Father] and [Maternal Grandmother] testified that [Father] made arrangements to send birthday presents to [Child] in April 2020.

(i) [Father] testified and provided written proof that he did pay child support for [Child] when he was employed and able to do so.

(j) [Father] testified that he had filed for custody for [Child] on at least five (5) separate occasions without an attorney and that [Mother] had been held in contempt for failing to allow him to see [Child] five (5) times.

(k) [Father] did not have the financial resources to hire legal counsel to advise him of his rights pursuant to the Custody Order.

*See id.* at 29-35.

Regarding his third issue, Father argues that the trial court should not have addressed 23 Pa.C.S.A. § 2511(b), because Petitioners failed to produce clear and convincing evidence that his parental rights should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (2), and the trial court concluded that Mother acted in a manner to block his efforts to maintain a relationship with Child. *See* Father's Brief at 35-40.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept

- 8 -

the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, … 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and

convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will address section 2511(a)(1), (2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1)-(2), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

Regarding the definition of "parental duties," this Court has stated that

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

- 11 -

*Id.* at 855 (citations omitted).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

"[O]nce the statutory grounds for termination have been met under [s]ection 2511(a), the [trial] court must consider whether termination serves the needs and welfare of the child, pursuant to [s]ection 2511(b)." *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In*

- 12 -

*re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

[C]oncluding [that] a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. … Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

- 13 -

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his … child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

The trial court addressed Father's first issue regarding section 2511(a)(1) as follows:

> Petitioners argue that Father's parental rights should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (2). Counsel for the [C]hild agrees that Father's parental rights should be terminated. Father argues that his parental rights should not be terminated because he has attempted to maintain a parent-

child relationship to the best of his ability. He also argues that Mother has sabotaged his attempts to contact [Child] and he would like the opportunity to remain a part of his [C]hild's life.

* * *

There is no evidence that Father performed any parental duties for a long time. [Child] is now nine years old. It is unclear when he last saw [Child] physically, but by his own admission, it was at least a year ago.

While there is evidence that Mother put some obstacles in place, Father did little to actively pursue a relationship with his daughter. He made no meaningful effort to overcome those obstacles. Instead he traveled to Las Vegas and California on vacation with a friend, and moved to New Jersey[,] where he resided for about a year without attempting to contact [Child]. Mother made it difficult for him to have a relationship with [Child] at times, but he failed to exert reasonable efforts or firmness in overcoming those obstacles for the sake of his [C]hild.

Father seems most interested, even now, in assuming his role as parent to [Child] merely through conversations with her. He presented no plans for assuming other parental duties and has no job and no driver's license. Father fails to recognize that being a parent includes plans for providing for the emotional, financial, educational, spiritual, and physical needs on a daily basis for the [C]hild's well-being.

We have consistently held that being a parent is more than a passive state and requires that a parent take an active role. That active role must be taken even when obstacles may impede the parent-child relationship. Instead, Father remained passive and failed to exert much effort to establish or maintain a relationship with his [C]hild.

Father's most enthusiastic efforts took place after the [P]etition to terminate his rights was filed. But even those efforts were minimal.

We find that Petitioners have presented clear and convincing evidence to establish that Father failed to perform his parental duties for at least six months prior to the filing of the [P]etition to

terminate. A finding pursuant to just one of the nine delineated sections is sufficient to terminate Father's parental rights.

Trial Court Opinion, 12/15/20, at 5-8.

Regarding section 2511(a)(2), the trial court stated as follows:

Father has a history of being absent in the [C]hild's life. He resided in New Jersey for at least one year with no attempts to contact [Child] during that time. A vacation with a friend took him across the country for many weeks. Father's focus was not on [Child] during those times.

Father has not seen [Child] in at least a year and other than stating that he would "like" to see her, did nothing else to make that happen. He paid child support for some period but is gravely in arrears[,] and apparently made the conscious decision to not contribute to [Child] support because his rights might be terminated.

*Id.* at 8-9.

Finally, the trial court addressed Father's third issue, regarding section

2511(b), as follows:

[Child] has resided with Mother since her birth[,] and with [Stepfather] and her [M]other since they married in 2018. There are two other children in the household. The family has a good relationship. [Child]'s daily emotional, financial, and spiritual needs are being met and she is being cared for in a safe environment.

[Child] has not been in Father's care for years and there is no evidence that there is any bond with him. [Child's] reaction to him and his gifts in April 2020 was awkward and strained. Although Father claims that he does not want his parental rights terminated, there is no evidence that any harm would come to [Child] by terminating his rights. There is no evidence that [Child] has any bond with Father[,] or that there would be any harm to the [C]hild by terminating the parental rights of Father.

> We conclude that the termination of the parental rights of the natural Father … is in the best interest, need[s], and welfare of [Child].

*Id.* at 9-10.

Our review confirms that there was competent evidence in the record from which the trial court could conclude that Petitioners had met, by clear and convincing evidence, the requirements of sections 2511(a)(1), (2), and (b).  ***See id.*** at 5-10.  Discerning no error of law or abuse of discretion by the trial court, we affirm the Decree terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/22/2021